No. 48,248

Lola B. Jones and Marie R. Wilson, *Appellants,* v. Kansas Gas and Electric Company and The Gas Service Company; State Corporation Commission, *Appellees.*

(565 P.2d 597)

Opinion filed June 11, 1977.

*Brian J. Moline* and *William Rich,* of the Legal Aid Society of Wichita, Inc., argued the cause and were on the brief for the appellants.

*Ralph Foster,* of Wichita, argued the cause and was on the brief for the appellee, Kansas Gas and Electric Company.

*Richard C. Byrd,* of Ottawa, argued the cause, and *Donal D. Guffey,* of Kansas City, Missouri, was with him on the brief for the appellee, The Gas Service Company.

*W. Robert Alderson,* general counsel, and *Carl M. Anderson,* assistant general counsel, were on the brief for the appellee, State Corporation Commission.

*Curt T. Schneider,* attorney general, and *Lance A. Pool,* assistant attorney general, were on the brief of the Attorney General of the State of Kansas, as *amicus curiae.*

The opinion of the court was delivered by

OWSLEY, J.: This is an appeal from a district court order affirming the decision of the State Corporation Commission of the State of Kansas (Commission) dismissing a complaint filed by Lola B. Jones and Marie R. Wilson (complainants) attacking the validity of the late payment charges imposed by the Kansas Gas and Electric Company (KG&E) and the Gas Service Company (Gas Service).

The complaint, filed August 3, 1972, alleged that Jones was a subscriber to the services of KG&E and on May 10, 1972, she received a bill for services in the amount of $11.64. The bill stated that if she did not pay the amount due by May 24, 1972, she would have to pay a late payment charge of fifty-nine cents. Wilson was a subscriber to the services of Gas Service and on June 16, 1972, she received a bill for services in the amount of $16.46, $9.60 of which was past due from previous billing periods. Her bill stated that if she did not pay the amount due by June 30, 1972, she would have to pay a late payment charge of thirty-four cents. The complainants further stated that both were public assistance recipients; therefore, they encountered great difficulty in paying their utility bills within the allotted payment period and were forced to pay late penalties. In addition, complainants alleged the utility companies did not allow customers to choose a convenient date for billing purposes. According to complainants, the late charges were usurious interest in violation

of K.S.A. 16-201, *et seq.;* violated the Kansas Truth In Lending Act (K.S.A. 16-801, *et seq.,* now repealed) and the Federal Truth In Lending Act (15 U.S.C., Sec. 1601, *et seq.*); and were "unjust, unreasonable, arbitrary, capricious, unjustly discriminatory, and unduly preferential, all in violation of K.S.A. 66-107."

Complainants asked the Commission to convene and conduct an investigation and (1) compel the utilities to permit a 45-day period to expire from billing before assessing any late penalty; (2) allow utility subscribers to choose their own regular billing date; (3) limit late charges to no more than one-half of 1% of the principal of their bills; (4) require the utility companies to conform their billing practices with K.S.A. 16-820 and 15 U.S.C., Sec. 1637; and (5) apply all previously paid late charges, together with 6% annual interest, to the accounts of their respective subscribers.

KG&E answered the complaint admitting jurisdiction and identity of the parties. As a defense it stated the late payment charges were provided within its approved rates as follows:

"GROSS MONTHLY BILL
"The net monthly bill; computed in accordance with the Net Monthly Rate, plus 5% on the first $200 and 2% on the balance thereof.
"PAYMENT
"The net monthly bill is due and payable when rendered; when not paid within 15 days from date, the Gross Monthly Bill applies."

Gas Service answered in a similar fashion, setting forth Rule IV (a) of its rules and regulations on file and approved by the Commission, which stated:

"Bills for service shall become delinquent fifteen (15) days after date of the bill or meter reading in case of self billing. If bill becomes delinquent, a 5% penalty charge will be added on the first $200 and 2% on the balance thereafter. ⁑ ⁑ ⁑ "

Both respondents asserted the late charge was necessary to encourage prompt payment, to offset the cost of handling, processing and collecting delinquent accounts, and was reasonable; that the charge was neither interest nor a charge for forbearance of collection and therefore neither usurious nor in violation of K.S.A. 16-201, *et seq.;* and that the provisions of K.S.A. 16-801, *et seq.,* and 15 U.S.C., Sec. 1601, *et seq.,* specifically excluded application to public utilities.

Hearings commenced on January 16, 1973, and continued

intermittently until their conclusion on February 23, 1973. The matter was taken under advisement, and on April 3, 1974, the Commission rejected *in toto* the complainants' allegations and requested relief. Petition for rehearing was denied. Jones and Wilson then filed a petition in district court for judicial review, pursuant to K.S.A. 66-118c. Following submission of the transcript and briefs, the district court issued an order sustaining the Commission's order of dismissal. This appeal ensued.

Before proceeding further, the billing practices of the respective utilities should be disclosed. Gas Service and KG&E, as well as most other utility companies in this state, practice "cycle billing." Under this system the utility divides its service area into geographic districts for meter reading and billing purposes. The districts are read and billed so all are processed in a continuous cycle. Gas Service bills on a 30-day cycle. Since there are normally 21 working days in each billing period, the service area is divided into 21 districts. If a customer lives in a district where bills are prepared on the first day of the month, his meter is usually read on the 25th or 26th day of the preceding month. After the meter is read, the meter reading card is sent to the Gas Service central office where the computer prepares the bill. It is then shipped to the local office and on to the customer, who receives it on the 4th. The customer has until the 15th to pay his bill without incurring the 5% late payment charge; however, Gas Service takes no action to collect late bills until the 22nd. At that time all bills in the district are reconciled to determine which customers are tardy, and second notices are prepared and mailed to those customers. The second notice informs the customer that his service may be shut off if payment is not made within 10 days. Gas Service generally waits a week after the shut-off date listed on the customer's second notice, then sends a collector to the customer's address to either collect the bill or shut off service. The time elapsing from preparation of the first bill until potential termination is about 41 days.

KG&E uses a similar billing system, except its second notice is not mailed until 10 days after the late payment charge is assessed, or 25 days after the bill is initially prepared. Like Gas Service, this is KG&E's first effort to collect a delinquent account after initial billing.

As indicated, both complainants were subscribers to services of

the utilities and had been assessed late payment fees. KG&E had threatened to terminate Jones' service eleven times for nonpayment of bills. Wilson had paid her bill to Gas Service without incurring a penalty only eight times in the two years preceding the complaint. Both alleged their tardiness was attributable to the fact they received their public assistance checks on the first of the month and by the time they paid other bills they did not have enough to pay their utilities. As a result a late charge was imposed before they received their next checks and paid their bills. Since they received their welfare checks at the first of the month they felt the utilities should be required to bill on a date chosen by each individual consumer and there should be a 45-day period before any late penalty was assessed. Furthermore, they felt penalties should be limited to one-half of 1% of their bills.

To support their position, complainants called Warren J. Samuels, Professor of Economics at Michigan State University. As an author of many articles, he testified as an expert on utility billing practices, particularly late payment charges. He felt that "net-gross billing," "forfeited discounts" or "late penalties" are semantically interchangeable and that in reality all these charges are interest, not a penalty. A 5% charge assessed as a penalty on a late bill, in his opinion, is usurious interest. To illustrate his point he noted that the 5% assessed on a bill due on the 15th of the month would amount to more than 1800% annual interest if the bill were paid on the 16th. If the bill were paid on the 17th the annual interest rate would drop to about 900%. He concluded that because the late penalty was a one-time charge and the actual interest rate declined each day a bill was not paid after the late penalty was assessed, late penalties were dysfunctional to their purpose of encouraging people to pay their bills promptly. He also stated that utilities do not attempt to collect delinquent accounts until 22 to 25 days after the initial bill is rendered and 7 to 10 days after the penalty is imposed; therefore, there are actually three classes of customers involved: (1) Those who pay on time and incur no penalty; (2) those who do not pay on time and incur a penalty, but pay before any collection effort is made; and (3) those who do not pay on time and incur a penalty, but force the utility company to undertake additional collection efforts. He concluded late charges assessed against the second class of persons were unreasonable because the utility companies

suffered no collection costs because of them. The witness further stated there would be no inconvenience to the utilities to extend their current 15-day billing cycle to 30 days or longer. Although he had no hard data he concluded it would not create any additional delinquencies or bad accounts.

KG&E and Gas Service defended their present billing practices and attacked complainants' requests as unreasonable. They explained that the present system of "cycle billing" is the most efficient use of personnel and equipment possible and has the effect of keeping down their overall rates. If they were required to allow consumers to choose their own billing date or if they were required to issue all bills at the first of the month, cycle billing would be disrupted and accounting costs would increase dramatically.

Witnesses for both utilities testified that "late payments," "forfeited discounts" or "net-gross charges" were used (1) to encourage prompt payment of bills, and (2) to levy collection costs against those persons responsible for creating them. They contended that elimination of the late payment charge or creation of an extension beyond the current 15-day grace period would do substantial harm to the utilities by increasing delinquent accounts, collection costs and bad debts. Kenneth E. Holeman, assistant controller for Gas Service, supported this argument by pointing out that Wichita Gas Company (predecessor to Gas Service) imposed a 10% late penalty prior to 1927. That year the penalty was reduced to the present 5% charge. At the same time the amount of delinquent payments rose from 7.9% to 16.7%. W. B. Walker, secretary and comptroller for KG&E, stated that he had studied billing practices for more than twenty years. In his experience with KG&E, other utility companies, and professional study he determined that late charges encourage prompt payment and the greater the period of time between billing and imposition of the late charge, the greater the number of delinquent accounts and uncollectible debts. Holeman testified than an additional 15-day extension before imposing a late charge would cost Gas Service $159,000 a year for extending credit and would increase bad debts by $45,000. Bad debts are written off the books and have the effect of being borne by all customers through higher overall rates.

These conclusions were supported by intervenors Kansas City

Power & Light Company (KCP&L) and Central Telephone & Utilities Corporation (CT&U). Louis C. Rasmussen, assistant manager for rates at KCP&L, explained that his studies indicate a 15-day extension of the present period would double the number of late payments and bad debts. This would increase collection costs and ultimately the overall utility rate. John C. Ewing represented CT&U. He said the utility serves areas in Kansas and Colorado. In Kansas the "net-gross" billing method is used; however, no late charges are imposed on Colorado customers, as the Colorado tariff does not allow the practice. Ewing stated:

"I have made a study of the company's recent experience with delinquent acccounts in Colorado similar to the study which I made in Kansas. This again was for the month of December, 1972. At the end of the first 15 days following issuance of the bill, 21,514 customers, or 35.7% of the total 60,252 customers in Colorado had not paid their bills. This compares with 9,012 customers, or 16% of the total in Kansas. At the end of the first 30 day period, 11,860 customers, or 19.7% had not paid their bills in Colorado. This compares with 5,229 customers, or 9.3% in Kansas. At the end of the first 60 day period, 2,594 customers, or 4.3%, had not paid their bill in Colorado. This compares with 708 customers, or 1.3% in Kansas.

"My study shows that the percentage of customers [who] do not pay promptly in Colorado is more than twice as high as it is in Kansas. In my opinion, the gross-net billing that we have in Kansas is effective in producing prompt payment."

The utilities further argued that the 5% late charge was not unreasonable or excessive. They pointed out that the cost of collection should be borne by those causing it or it would have to be assimilated into the general rate structure. This would discriminate because it would require the prompt paying customer to share in costs created by another class of customers.

The present late charge was designed to recover collection costs. Based upon company records, KG&E spent $463,529 in collecting delinquent accounts and at the same time collected late fees in the amount of $355,670. Gas Service collected $444,220 in late payment charges, spending $484,984 collecting late bills. Both utilities argued late fees could not be considered interest because the charges were directly related to the real cost of collecting delinquent accounts. The Commission agreed.

I. Scope of Review

The scope of review is controlled by K.S.A. 66-118d. It is limited to determining the lawfulness and reasonableness of the order of the Commission and this court has no power to set aside its order unless it is found the Commission acted unlawfully or

arbitrarily without supporting evidence. (K.S.A. 66-118d; *Central Kansas Power Co. v. State Corporation Commission,* 206 Kan. 670, 482 P. 2d 1; *Colorado Interstate Gas Co. v. State Corporation Comm.,* 192 Kan. 1, 386 P. 2d 266.) If the order of the Commission is based upon substantial competent evidence the order will generally be considered reasonable. (*Central Kansas Power Co. v. State Corporation Commission,* supra; *Rock Island Motor Transit Co. v. State Corporation Comm.,* 169 Kan. 487, 219 P. 2d 405; *Southern Kansas Stage Lines Co. v. Public Service Comm.,* 135 Kan. 657, 11 P. 2d 985.) Substantial competent evidence is evidence which possesses something of substance and relevant consequence, and which furnishes a substantial basis of fact from which the issues tendered can reasonably be resolved. (*Graves Truck Line, Inc. v. State Corporation Commission,* 215 Kan. 565, 527 P. 2d 1065; *Morra v. State Board of Examiners of Psychologists,* 212 Kan. 103, 510 P. 2d 614; *Kansas State Board of Healing Arts v. Foote,* 200 Kan. 447, 436 P. 2d 828, 28 A.L.R. 3d 472.)

II. Application of Interest Laws to Late Charge

Complainants characterize the late charge as usurious interest, relying upon K.S.A. 16-201. They argue that since they did not agree to the imposition of the 5% charge the highest rate of interest they can be assessed is 6% per annum; therefore, all charges in excess of the legal rate are usurious.

This argument overlooks the clear language of the statute and the settled case law of this state, both of which limit the application of 16-201. Interest is defined as compensation allowed by law or by agreement of the parties for the use or forbearance of money. (*Shapiro v. Kansas Public Employees Retirement System,* 216 Kan. 353, 357, 532 P. 2d 1081; *Brown v. Hiatts,* 15 Wall. 177, 185, 21 L. Ed. 128.) The following cases have held that late payment charges are not interest: *Ferguson v. Electric Power Board of Chattanooga, Tenn.,* 378 F. Supp. 787 (E.D. Tenn. 1974), aff'd mem., 511 F. 2d 1403 (6th Cir. 1975); *Delich v. Iowa Electric Light & P. Co.,* 9 P.U.R. 4th 335 (1975); *Re Utah Power & Light Co.,* 19 P.U.R. (N.S.) 369 (1937).

Public utilities have now been specifically excluded from the restraints of consumer credit laws because of their regulated status. During the pendency of this suit Kansas adopted the uniform consumer credit code, known as the UCCC (K.S.A. 16a-1-101, *et seq.*). The Kansas Comment to K.S.A. 16a-1-102

states that "[o]ne of the primary purposes of the U3C is to place under a single statutory umbrella all aspects of consumer credit, thereby treating the subject as a functional unity." The Comment to 16a-1-108 states that the act displaces prior usury laws relating to consumer transactions. Thus, even if late payment charges are considered interest they are not subject to 16-201 because the sale of commodities is a consumer transaction. Credit charges by public utilities are specifically exempted from the UCCC (16a-1-202 [3]), however, because they are regulated by other means. (K.S.A. 66-101, *et seq.*) Public utilities have also been freed from application of the Kansas Truth In Lending Act (K.S.A. 16-801, *et seq.*, now repealed) and the Federal Truth In Lending Act (15 U.S.C., Sec. 1601, *et seq.*) because of specific statutory exemptions, and complainants' argument that utilities must comply with these laws has no merit. (K.S.A. 16-804; 15 U.S.C., Sec. 1603; 12 C.F.R., Sec. 226.3 [d].) See also, *Ferguson v. Electric Power Board of Chattanooga, Tenn.,* supra; *State Ex Rel. Guste v. Council of City of New Orleans,* 309 So. 2d 290 (La. 1975). The appropriate basis for regulation of late charges by a public utility is neither the usury statute nor consumer credit laws; regulation of late charges rests solely with the agency of the state vested with the authority to supervise operation of the utility, subject to judicial review of the reasonableness of the rate. (*State Ex Rel. Guste v. Council of City of New Orleans,* supra.)

III. Reasonableness of Late Charge

The question next arises as to whether the late charge allowed by the Commission is reasonable. Complainants allege it is not and mount their attack on several fronts. They contend the present billing system is unreasonable because (1) it discriminates against low income persons; (2) it does not conform to standard commercial practices; (3) it does not encourage prompt payment; and (4) it does not reasonably assess collection costs against those who create them.

A considerable portion of complainants' brief is devoted to the proposition that present billing practices discriminate against low income families, older persons, welfare recipients and persons on fixed incomes. They argue that because the utilities use "cycle billing," coupled with a short payment period, these persons are consistently required to pay an excessive late charge. Complainants asked the Commission to require the utilities to

allow consumers to choose the date on which they are billed and that the time for payment be extended to 45 days before a late penalty is imposed. The Commission ruled that both requests were unreasonable.

We believe there was substantial competent evidence to support the ruling of the Commission on both requests. Allowing consumers to choose the date on which they were to be billed would increase operating costs. Extending the time for payment would increase the amount of borrowed capital necessary to operate and would increase delinquent accounts, collection charges and bad debts. Ultimately, these increases would reach the general public through rate increases. The Commission correctly noted that the solution to the problems did not lie within the purview of the Commission to solve by forcing the general public to shoulder larger utility bills.

The Commission further found there was no proof the utilities intentionally designed their billing to discriminate against lower income consumers. On the contrary, the record indicates this class of persons is spread throughout the respective service areas with no significant concentration in one billing district over any other. Absent any proof the utilities have deigned to discriminate against the poor, this court can offer no relief. (*State Ex Rel. Guste v. Council of City of New Orleans,* supra.) Mere disparity of wealth alone does not require a court to act. (*San Antonio School District v. Rodriguez,* 411 U.S. 1, 36 L.Ed. 2d 16, 93 S.Ct. 1278.)

Complainants next assert the late charge is inconsistent with standard business practices and therefore contrary to public policy. The inherent weakness with the argument is the fact respondents are not standard commercial enterprises; they are public utilities which are regulated by the state. (K.S.A. 66-101, *et seq.*) The legislature has declared that utility services are affected with a public interest. Every common carrier and public utility controlled by the Commission is required to serve all members of the general public without discrimination and must establish just and reasonable rates, fares, tolls and charges. (K.S.A. 66-107.) Rates, regulations and charges must be published (K.S.A. 66-108), and must not be ignored except within strict exceptions. (K.S.A. 66-109.) Utilities cannot refuse to serve a slow-paying customer or a credit risk who might be turned away by a local merchant. In order to compensate for this factor utilities are allowed to require

deposits and impose late charges to minimize the risk of bad debts. The operation of a public utility cannot be compared with an ordinary business. (*Delich v. Iowa Electric Light & P. Co.,* supra.)

Complainants argue throughout their brief that there are ways to enhance and improve present billing and collection procedures. These were considered and rejected by the Commission. Ignoring the limited scope of review possessed by this court, complainants attempt to convince us of the viability of their proposals. Suffice it to say that the existence of another method of collection does not preclude our determination that the methods previously mentioned are nonetheless reasonable. The choice of a method of collection remains with the Commission. Our review is limited to a determination of whether a method is reasonable, not whether it is the most desirable of those possible. Having made this determination we need not consider the merits of the alternatives proposed in the complainants' brief.

Complainants contend that late payment charges do not encourage prompt payment. The evidence clearly disproves this fact. Both respondents and two intervenors, KCP&L and CT&U, presented opinion evidence and statistics which demonstrated that customers facing late charges pay more promptly than those who are not faced with late charges, and the greater the late charge the more promptly they pay. In their challenge, complainants presented evidence that Southwestern Bell Telephone did not levy a late charge and still collected 92% of its bills without any collection effort after initial billing. The Commission distinguished Southwestern Bell from KG&E and Gas Service on the basis that Southwestern Bell bills in advance of service to be performed, while KG&E and Gas Service bill for past service. The distinction is valid.

Finally, complainants allege the late charge is unreasonable because it does not assess collection costs against those who create such costs. Before examining the point it is necessary to review the billing procedure. When bills are prepared on the first day of the month they are due on the 15th. If a consumer does not pay by that date the 5% penalty is added. No additional action is taken by the utility company to collect the bill until later. Gas Service prepares its second notice on the 22nd. KG&E does not prepare its second notice until the 25th. The evidence is uncon-

troverted that until the second notice is prepared neither utility makes any effort to collect any of the outstanding accounts. Yet, during this time customers continue to pay their bills, including the 5% penalty assessed as a late charge and collection fee. KG&E collected $355,670 while it spent $463,529 on collections. Gas Service collected $444,220 while it spent $484,984 collecting late bills.

There are two classes of late payers: (1) Those who pay after a penalty is imposed but before collection efforts are initiated, and (2) those who do not pay until the utility company is forced to make additional collection efforts. The practice of assessing the same penalty against the two classes is unreasonable. Forty-four percent of all persons paying late fees to KG&E did so although they did not cause the company to incur any expense other than the extension of credit for the time between the date the late penalty was imposed and the date the bill was paid. KG&E's cost of extending credit to all its late customers was only $11,333. Assuming the first class of late payers shared the same proportion of the cost of credit as their percentage of the entire group (44%), they would cause KG&E to extend $4,986.52 in credit. However, the actual proportion must be smaller, as the remaining 56% of late payers still had not paid their bills and forced the company to extend them additional credit. The number of persons comprising the first class of late payers for Gas Service is not known; therefore, similar calculations are not possible.

While the first class of late payers cost KG&E $4,986.52 in credit, they paid $156,494.80 in late fees. Had all late payers paid between the 15th and 25th day, before second notices were sent, KG&E would have collected $355,670 in penalties and spent nothing for collection. This further illustrates the irrational application of the present late penalty system.

The touchstone of public utility law is the rule that one class of consumers shall not be burdened with costs created by another class. (*Coffelt v. Ark. Power & Light Co.,* 248 Ark. 313, 451 S.W. 2d 881 [1970]; *Utilities Comm. v. Consumers Council,* 18 N.C. App. 717, 198 S.E. 2d 98 [1973].) The Commission recognized this rule and we are in full accord. The problem is whether this theory is carried out by charging a uniform penalty or charge to all delinquent customers. The evidence demonstrates that many delinquent customers pay their bills before any collection costs

accrue. Under the present system they must pay the same as the more recalcitrant customer pays. The argument advanced by the utility companies, the theory of which we approve, is that a prompt paying customer should not be burdened with the expense caused by someone else; but when fairness to the first class of late payers is considered we find they are required to do the very thing the penalty is intended to prevent, and are required to contribute toward the cost of collecting the bills owed by the more delinquent customers. To this extent we think the practice of assessing the same penalty against all delinquent customers, regardless of the nature or character of their delinquency, is discriminatory and unfair. (*Ford v. Waterworks Co.,* 102 Miss. 717, 59 So. 880 [1912]; *Pub. Serv. Com. of Mo. v. Kansas City Power & Light Co.,* 2 P.U.R. [N.S.] 391 [1933].)

Our decision does not condemn the use of a late penalty. There is ample justification for imposing a late payment charge. (*City of Columbus v. Gas Co.,* 96 Kan. 367, 149 Pac. 402; *Southwestern Tel. Co. v. Danaher,* 238 U.S. 482, 490, 59 L.Ed. 1419, 35 S.Ct. 886.) The charge which is levied, however, must be reasonably related to the purpose to be achieved; and if the purpose is to recover collection costs the utility company must collect from the class of consumers creating the costs. The penalty charged the late payer who causes the utility company to incur collection costs should reflect those costs and should be more than the penalty charged the late payer who does not cause collection costs. The penalty against the first class of late payers should be less than the penalty against the late payer who causes collection costs and should be limited to an amount which encourages prompt payment and covers the cost of extending credit.

We conclude the action of the Commission relating to utility billing and late payment charges is not unreasonable except as to the imposition of a uniform late penalty. That portion of the judgment of the district court which affirmed the Commission's decision on the reasonableness of the late charge is reversed and the case is remanded with directions to return the matter to the Commission for further proceedings consistent with the opinion.

The decision of the district court is affirmed in part and reversed in part and remanded with directions.

SCHROEDER, J., not participating.

FROMME, J., dissenting.

Any classification of customers made for the purpose of fixing late payment charges is bound to be arbitrary in nature. Some discrimination will necessarily result in fixing the classes. Late payment charges have the effect of decreasing late payments and bad debts. Those are the primary purposes for allowing such charges to be made. Such charges appear to be a means of accomplishing a legitimate purpose in the rate making process. A late payment charge requires that some arbitrary time limit be set for paying bills. This of necessity fixes two arbitrary classes of customers—those who pay on time and those who don't.

The majority on this court seem to agree that a five percent (5%) late charge on customers who fail to pay their bills within some arbitrary time limit after billing is reasonable. However, the majority hold that such a charge is unduly discriminatory, unless an additional class of late-late paying customers be recognized. At this point I disagree with the majority and will briefly set forth my reasons.

To require the state Corporation Commission to further divide late paying customers into additional classes so as to burden the late-late paying customers with some additional expense incurred in securing payment of their bills is both economically burdensome and practicably unworkable. Where are the lines of classification to be drawn? Should the additional classification be set on a basis of payment after additional days, weeks or months from the first billing? If so, how do you arrive at a flat charge for these late-late paying customers which will reflect the actual costs incurred for postage, bookkeeping, billing, personal collection efforts, costs of turning off meters and of restoring service up to the time a bill is finally paid?

What I am saying is that any further classification of late-late paying customers must likewise be made on an arbitrary basis and not on the basis of the actual expenses incurred. Some discrimination will result regardless of where the lines are drawn. Some economically feasible balance must be struck between expenses incurred and classifications to be charged.

The rule that one class of consumers shall not be burdened with costs created by another class as set out in paragraph 10 of the syllabus was designed for classifications of customers based upon the different classes of utility service received. See *Central Kansas Power Co. v. State Corporation Commission,* 221 Kan.

505, 561 P. 2d 779. It was not designed to apply to subclassifications of customers used in determining proper variances in late payment charges.

In the present case all customers are residential customers in and around Wichita and the costs of generating and transmitting their electrical energy are the same. Relatively, the amount of late payment charges collected is minor in comparison to the costs of generating and transmitting energy. The amount of the late payment charges of one of the two complainants in the present case, when figured over a 24-month period, amounts to an average of 38 cents per month. She made only 14 payments to the utility during this 24-month period.

K.S.A. 66-107 requires that utility charges be just and reasonable and that classifications used to fix such charges not be unduly preferential or unreasonably discriminatory. I consider the late charge of 5% in this case reasonable and I do not consider the classifications, those who pay on time and those who do not, unduly discriminatory.

The power and scope of judicial review provided in K.S.A. 66-118d does not give the courts authority to substitute their judgment for that of the commission. It is only when the commission's determination is so wide of the mark as to be outside the realm of fair debate that a court may nullify it. (*Central Kansas Power Co. v. State Corporation Commission,* supra, Syl. 2.)

The matter falls within the realm of fair debate and I would affirm the district court's judgment which approved the order of the commission.

KAUL J., joins in the foregoing dissenting opinion.